Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkim@schneiderwallace.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL DYLAN KRAMER, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HENRY SCHEIN, INC.; PATTERSON CO., INC.; BENCO DENTAL SUPPLY CO.; AND UNNAMED CO-CONSPIRATORS <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF CALIFORNIA
BUSINESS AND PROFESSIONS CODE §§ 16720 AND 17200**

Plaintiff and members of the proposed Class purchasing dental services in California have suffered antitrust price injury due to a long-term, unlawful boycott and price fixing conspiracy of Defendant distributors Henry Schein, Inc. ("Henry Schein"), Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco") (collectively "Defendants") in a United States relevant market for the distribution of dental supplies. This conspiracy has unlawfully overcharged California dental practices, orthodontic practices, and dental laboratories (collectively "dental practices") on their purchases of dental supplies. In turn, these California dental practices have passed on, all or in part, their antitrust price injury to members of the California Class purchasing dental services.

**NATURE OF THE ACTION**

1.      Members of the proposed California Class of Dental Purchasers have paid for dental services provided by hundreds of California dental practices. These practices procure dental supplies directly provided by Defendants, which are the three largest distributors of dental supplies in the United States. Insulated by high barriers to entry (heightened by the conspiracy's boycotting of competitors), the conspiracy accounts for between 80% and 90% of sales in a relevant supplies market.

2.      Defendants have violated the Cartwright Act and California Unfair Competition Act with their agreement not to compete as to price and margins. This allows them to charge California dental practices well above competitive prices for dental supplies. This overcharging is in turn passed on, all or in part, to members of the proposed California Class of Dental Purchasers in their dental bills.

3.      In aid of their pricing conspiracy, Defendants have pursued four strategies. First, they have sought to fix pricing through an effort to reach agreed margins on sales across these major distributors. As Henry Schein's Regional Manager Mark Lowery has put it, the aim of the margin-fixing scheme is to ensure that dentists "get[] [dental products] for the same price no matter who they buy it from" so that "we all get paid," and the scope of this margin-fixing scheme has run

1  "unanimously across the industry [for] as long as [I have] been in the dental business."

2      4.    Second, Defendants have conspired to boycott the entry and expansion of competing

3  distributors offering lower supply prices by boycotting, or threatening to boycott, manufacturers

4  supplying the discounters by denying the manufacturers essential distribution by Defendants. They

5  have also boycotted, or threatened to boycott, (a) the trade shows of state dental trade associations,

6  (b) dental practices, and (c) other industry participants dealing with, or promoting, lower-priced

7  distributors.

8      5.    Victims of the unlawful boycotts include multiple discounting distributors including

9  SourceOne Dental, Inc., TDA Perks, Archer & White, and Amazon.com, Inc. These innovative,

10  lower-priced distributors often seek to partner with state dental associations which aggregate their

11  members' purchasing volumes to bring down prices.

12      6.    Third, Defendants have divided among themselves the relevant market by agreeing

13  not to "poach" one another's sales representatives and the dental practices serviced by these sales

14  representatives.

15      7.    The Defendants' conduct is *per se* illegal under the Cartwright Act by fixing prices,

16  boycotting, and dividing the relevant market. Overcharges inflicted on the California dental practices

17  by the conspiracy have been passed on, all or in part, to their customers, members of the proposed

18  Class of Dental Purchasers. Defendants' conduct also constitutes unfair competition under the

19  California Unfair Competition Act.

20      8.    Each Defendant is jointly and severally liable for all damages inflicted on the proposed

21  Class.

22                     **JURISDICTION AND VENUE**

23      9.    This Court has original subject matter jurisdiction over this matter under 28 U.S.C.

24  § 1332(d)(2) because the matter in controversy exceeds the sum of $5,000,000, exclusive of interest

25  and costs, and members of the California Class alleged herein are citizens of California, whereas each

26  Defendant is a citizen of a State other than California.  28 U.S.C. § 1332(c)(1).

27      10.    Venue is proper because Defendants reside within this District and are subject to

28

1  personal jurisdiction within this District. 28 U.S.C. § 1391(b). Defendants maintain offices, regularly

2  transact business, have agents, and/or are otherwise found within this District.

3      11.    Each Defendant has significant contacts with the State of California and this District,

4  and Defendants' conduct occurred at least in part in this District, has affected commerce in this

5  District, and/or has caused injury, including to Plaintiff, in this District.

6  <center>**PARTIES**</center>

7      12.    Plaintiff Nathaniel Dylan Kramer ("Plaintiff") resides in this District and has received

8  dental services from dental practices in this District. During the relevant time period, Plaintiff

9  received, and paid for, a number of dental services and procedures. Plaintiff was overcharged for

10  these dental services and procedures because of the conspiracy alleged below.

11      13.    Defendant Henry Schein, which is incorporated under the laws of Delaware with its

12  headquarters in Melville, New York, is the nation's largest distributor of dental supplies.

13      14.    Defendant Patterson, which is incorporated under the laws of Minnesota with its

14  headquarters in St. Paul, Minnesota, is the nation's second largest distributor of dental supplies.

15      15.    Defendant Benco, which is incorporated under the laws of Delaware with its

16  headquarters in Pittston, Pennsylvania, is the nation's third largest distributor of dental supplies.

17      16.    Various other individuals and entities not named as defendants herein participated as

18  co- conspirators with Defendants and performed acts and made statements in furtherance of the

19  conspiracy.

20  <center>**RELEVANT MARKET**</center>

21      17.    Plaintiff alleges a horizontal, *per se* illegal conspiracy to fix prices, boycott, and divide

22  markets. To the extent Plaintiff's claims are found to be governed by the rule of reason, the relevant

23  product market is the market for the distribution of dental supplies. The relevant geographic market

24  is the United States.

25  <center>**THE CONSPIRACY'S MARKET POWER**</center>

26      18.    **Susceptibility of the Distribution Market to Collusion.** The United States relevant

27  market for the distribution of dental supplies has several characteristics making it susceptible to

28

<center>3</center>

1  collusion, which allows the conspiracy to maintain substantial market power and above-competitive

2  pricing. First, the distribution of supplies is highly concentrated. In total Defendants sell between

3  80% and 90% of the distribution services. The Herfindahl-Hirschman Index ("HHI") is a common

4  measure of industry concentration utilized by the United States Department of Justice, the Federal

5  Trade Commission, and economists. The HHI is over 3,000 for the relevant market. An HHI over

6  2,500 denominates a "highly concentrated" market. This high market concentration has made it much

7  easier for Defendants to collude to fix prices, boycott, and divide markets.

8      19.    Second, the relevant market has high entry barriers, greatly strengthened by

9  Defendants' boycotting. For example, state dental associations aggregating dental practices'

10  acquisitions of dental supplies are a crucial link in distribution. If Defendants' boycotting chokes off

11  competitors' distribution, this impedes their entry and expansion. By the same token, Defendants'

12  boycotting of manufacturers dealing with these discounters makes it even more difficult for them to

13  compete.

14      20.    Third, the relevant market is characterized by relatively static demand because adults

15  and children receive routine dental care and demand for this dental care is directly correlated with the

16  demand for dental supplies. Faced with static demand, distributors in a competitive market seek to

17  undercut one another's pricing to obtain market share. Here, the Defendants' fear of this lower pricing

18  has created a strong incentive for their collusion. By collusion among the dominant market

19  participants, Defendants have managed to increase their prices year-after-year across a broad range

20  of products, even though demand for dental supplies has been static. This pricing is inconsistent with

21  full and vigorous price competition and supports the inference that the relevant market is susceptible

22  to collusion and has been distorted by collusion.

23      21.    **Market Power.**  To treat their patients, dental practices regularly consume dozens if

24  not hundreds of different types of dental supplies. Supplies include in part acrylics, adhesive agents,

25  alloys, anesthetics, articulating products, burs, cements and liners, crown and bridge products,

26  endodontics, implants, impression materials, instruments, pins and posts, retraction materials, rubber

27  dam materials, waxes, infection control products, and x-ray accessories ("dental supplies").

28

22.     There are hundreds of manufacturers of dental supplies operating within the United States. To avoid the burden and expense associated with purchasing, processing, and receiving orders from dozens of manufacturers on a regular basis, dental practices use distributors, like Defendants, who stock a wide-ranging catalogue of the manufacturers' products. Approximately 75% of all dental supplies are sold through distributors.

23.     Defendants purchase dental supplies from dental manufacturers and resell them directly to dental practices. They charge the dental practices the products' costs of manufacture plus distribution fees (typically set as a percentage of costs).

24.     Because of the burden, expense, and inefficiency associated with purchasing, processing, and receiving orders from dozens of manufacturers, dental practices do not find purchasing directly from manufacturers a reasonable substitute for purchasing through distributors. By using the latter, practices can place, process, and receive fewer orders and shipments, saving both time and money as compared with ordering each of the various products they need from the individual manufacturers. Moreover, manufacturers themselves often lack their own distribution channels necessary to service the practices efficiently and in a timely manner. Some manufacturers do not even offer direct purchasing options. Thus the manufacturers cannot substantially discipline Defendants' collusive, unlawful pricing.

25.     Defendants have collusively achieved and maintained market power. They have the power to raise supply prices significantly above competitive levels without losing sufficient sales in the relevant market to make this above-competitive pricing unprofitable. The conspiracy controls between 80% and 90% of sales in the relevant market.

### THE CONSPIRACY

26.     The Defendants have conspired not to compete as to price and margins in the relevant market, allowing them to charge above-competitive prices despite static demand and competitive threats from multiple sources, including nationwide distributors, the internet, and innovative distribution business models.

## PERSISTENT AND LONG-TERM PRICE FIXING

27.     For years, Defendants have agreed on their distribution pricing consistent with maintaining their overall gross margins in the range between 26 and 28%. Since 2005, they have raised these prices and margins. Their collusive margins have been as much as 35% or higher, which are fully consistent with the conspiracy's exercise of market power.

28.     Defendants have orchestrated their collusion through private meetings at professional events, personal gatherings, text messages, phone calls, business and personnel email messages, and intermediaries, including, *e.g.*, the sales representatives and executives of dental supply manufacturers. Although there is little active recruitment among the Defendants for one another's sales representatives (as a result of a no-poaching agreement described *infra*), high level employees of Defendants frequently move among the Defendants which facilitates collusion.

29.     A Patterson employee from 2004 until 2015 confirmed the breadth and scope of the Defendants' agreement not to compete on price. He observed that at least during the period from 2011 to 2015, when he was responsible for dental sales for Patterson, he was not permitted to go below set minimum thresholds for gross margins, 28-30% on supplies. These thresholds were implemented on a nationwide basis. He recounts that, during his tenure, it was known throughout Patterson's sales division that Henry Schein also would not go below 32% and he would compete, if at all, for business on a basis other than price. This employee was regularly informed by others within Patterson that they knew that Schein would not go below a certain price.

30.     A former sales representative, who worked for Patterson and Benco, learned about gross margin thresholds at both companies from his managers, at monthly sales meetings, and during training sessions. He recalls that these thresholds were documented in handouts provided at monthly meetings. At both companies, the minimum margins were similar during his entire 15-year tenure in the industry.

31.     On August 31, 2012, Archer & White ("Archer"), a discounting distributor, filed an antitrust suit against Henry Schein, certain dental manufacturers, and unnamed co-conspirators alleging price fixing and exclusionary group boycotting. Just before this suit was filed, Ben Cohen,

1   the head of Benco, which was not named as a defendant in the lawsuit, learned that the suit was

2   imminent. He called James Archer of Archer to dissuade the company from pursuing the lawsuit,

3   offering almost $1 million by way of settlement, and urging Archer "to make the whole thing go away

4   without a lawsuit." He suggested that, even though Benco was not a party to the lawsuit, its filing

5   "will not work for Benco on a lot of different levels."

6        32.    That Benco, a supposed competitor of companies facing a serious antitrust lawsuit,

7   would offer to pay to make the suit go away to protect its supposed competitors is an action against

8   self-interest indicative of collusive behavior. Absent Benco's participation alongside other

9   Defendants in the pricing conspiracy, it made no business sense for Benco to indemnify Archer for

10  the anticompetitive conduct of its rivals.

11       33.    Underscoring Defendants' knowledge of their wrongdoing, Jack Powers, who was

12  employed by a smaller distributor of dental supplies that is a co-conspirator but not named as a

13  defendant here, Burkhart Dental Supply ("Burkhart"), told Schein's Lowery and Dynamic Dental's

14  ("Dynamic") Skip Pettus in 2008 that they "have to be very careful, if a customer doesn't like us, they

15  could have us all up on price fixing. . . ." or ". . . somebody complaining about getting together as a

16  group and saying: Okay, well, we're going to hold to a certain margin."

17                           **GROUP BOYCOTT IN AID OF PRICE FIXING**

18       34.    Several prominent actual and potential distribution competitors of Defendants have

19  been successfully targeted by Defendants' group boycott designed to avoid emerging threats to their

20  collusive pricing, including SourceOne, Amazon.com, Inc. ("Amazon"), and Archer, with its joint

21  venture partner Dynamic.

22       35.    In some cases, the Defendants give the discounting distributors a choice. Join the cartel

23  and raise their pricing or the Defendants would boycott them by pressuring manufacturers and state

24  dental associations not to deal with them.

25       36.    As to competitors not joining the conspiracy, Defendants have jointly leveraged their

26  power over manufacturers to suppress the discounters' competition at least as far back as 2008 and

27  done the same with state dental associations at least as far back as 2013.

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

37.     All else being equal, Defendants' price collusion and above-competitive profit margins should have enticed rival distributors to enter and expand in the relevant distribution market by offering lower prices and earning lower, but still profitable, margins. They could pay manufacturers more for their products than Defendants, while at the same time charging dental practices less for the same products. This enhanced competition should have, in turn, forced the Defendants to lower their collusive prices to competitive levels (or lose enough market shares making their collusive pricing unprofitable).

38.     At least as far back as 2004, Defendants' high prices and profit margins did in fact entice rival distributors to attempt to expand their market presences. However, their efforts were stymied by Defendants' boycotting (through manufacturers and state dental associations) to impair this competition.

39.     To successfully enter or expand, a rival distributor must be able to: (a) offer a comprehensive line of dental supplies; (b) purchase products in sufficient quantities to avail themselves of economies of scale; and (c) efficiently reach a sufficient number of dental practices.

### Boycott Target: SourceOne

40.     In October 2013, Source One, a new supplies distributor with a wide-ranging product offering comprised of over 50,000 dental supplies, created a dental supplies distribution platform in partnership with the Texas Dental Association ("TDA"). SourceOne's existing e-commerce platform, which operated nationwide, was already a lower-priced distribution option vis-à-vis those of Defendants. Its new sales platform, "TDA Perks Supplies," offered dental practices the opportunity to avail themselves of even lower distribution prices, an average 30% below those of Defendants. The platform was an immediate success and quickly positioned itself for nationwide expansion. Rivals besides SourceOne, drawn to the platform's initial success, began planning efforts with other state dental associations to implement similar programs.

41.     With the advent of an efficient national competitor that threatened their cartelized prices and sizeable profit margins, Defendants' reaction was swift, fierce, and coordinated. This aspect of the group boycott began in mid-to-late-2013, continues to the present, and involves three

1  interrelated actions.

2      42.    First, Defendants threatened manufacturers in concert: should they sell their products

3  through SourceOne, Defendants would refuse to sell or refuse to actively promote the manufactures'

4  products through their distribution channels. Because Defendants controlled nearly 80% to 90%

5  percent of the distribution market, the loss of Defendants' distribution would have been devastating

6  to these manufacturers. Defendants' collusive threats continue to be successful in coercing

7  manufacturers to abandon or forgo business relationships with SourceOne.

8      43.    These cut-off products represent a substantial portion of SourceOne's business.

9  SourceOne abruptly lost access to dozens of product lines, including many of SourceOne's most

10  important and highest-selling items. By April 2014 SourceOne had lost access to at least 75% of its

11  top selling products, crippling its ability to compete with Defendants.

12      44.    One of SourceOne's suppliers, an intermediary distributor called DDS Dental

13  Supplies, told SourceOne that it would no longer supply SourceOne because of pressure applied on

14  manufacturers by Defendants. Similarly, DMG America, a manufacturer of dental restoration

15  products, told DDS Dental Supplies that it would no longer allow its products to be supplied to

16  SourceOne because of the Defendants' threats.

17      45.    Other manufacturers that abruptly stopped allowing their products to be sold through

18  SourceOne include Sultan Healthcare, Danaher, Heraeus Kulzer, Ivoclar Vivadent, Quala, and

19  Septodont. None of these manufacturers or intermediary distributors had ever voiced any concerns

20  with SourceOne until after the 2013 announcement of SourceOne's innovative new distribution

21  platform and the beginning of the group boycott. Their decisions to stop selling to SourceOne were

22  contrary to their own economic interests (in the absence of the group boycott), as they forfeited

23  significant future revenues that would have been earned by continuing to sell to SourceOne.

24      46.    When SourceOne sought replacement suppliers, candidates, including DHP Dental,

25  were deterred from doing business with SourceOne as a result of Defendants' group boycott.

26      47.    Second, Defendants boycotted the annual meetings and trade shows of state dental

27  associations that were partnering or doing business with SourceOne and threatened to boycott those

28

9

1  that were considering the same.

2       48.     An important way to reach dental practices and manufacturers efficiently is to joint

3  venture with state dental associations. These voluntary associations of dentists possess an important

4  capacity to connect distributors with customers and suppliers. They can foster competition by

5  endorsing or joint venturing with new distributors, or distribution platforms, and providing them

6  efficient access to dental practices. These dental associations, however, can also serve as a "choke

7  point" at which incumbents like Defendants can—and did—leverage their collective market power

8  to block the entry of lower-priced rival distributors, including distributors with innovative sales and

9  distribution techniques that threatened the business models and profit margins of the Defendants.

10      49.     Traditionally, Defendants have sent sales representatives to participate in the annual

11 meetings and trade shows of state dental associations, and state dental associations depend on the

12 revenues generated by the participation of major distributors like Defendants at these events.

13      50.     In March of 2014, a Patterson representative met privately with TDA representatives

14 and demanded that the TDA end its relationship with SourceOne, or Patterson would withdraw from

15 the TDA's annual trade show and refuse to advertise in the TDA's publications. In April of 2014, a

16 Schein representative privately delivered an identical message.

17      51.     These threatened boycotts were coordinated and deterred other state dental

18 associations that had expressed interest in partnering with SourceOne from doing so, including, *inter*

19 *alia,* the Colorado Dental Association, the California Dental Association, and the Virginia Dental

20 Association.

21      52.     In the absence of the group boycott, SourceOne's new program would have spread

22 through the nation rapidly, as evidenced by an April 9, 2014 email, in which a representative of the

23 TDA wrote the "next link" in SourceOne's "unfolding saga" would be that "the American Dental

24 Association and most large states would [be] onboard in a nano-second, and that is the reason for the

25 suppliers' fear." And in a February 3, 2014 email from Schein to the TDA, Schein's Dean Kyle

26 threatened the TDA: "I am concerned the Board does not understand the far reaching impact" of its

27 decision to endorse and partner with SourceOne.

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

53.     When state associations refused Defendants' demands, Defendants carried through on their threats to boycott annual trade shows. They refused to attend trade shows organized by the TDA in 2014 and the Arizona Dental Association ("AZDA") in 2015 and forfeited substantial deposits advanced to the associations. A boycott of the Louisiana Dental Association's ("LDA") 2015 annual show was avoided only when the LDA abandoned its plans to associate with SourceOne.

54.     Defendants were the only distributors not to attend the TDA and AZDA events and dozens of dental supplies manufacturers also refused to attend TDA's 2014 trade show pursuant to Defendants' demands that they stay away. These manufacturers told TDA and AZDA that their decision to pull out of their events was a result of pressure applied by Defendants. The TDA and AZDA suffered financial hardship and their events were less profitable as a result of the boycott. Since the boycott, AZDA has not actively promoted SourceOne to its membership.

55.     These group boycotts had a cascading effect on other state dental associations. The LDA, fearful of Defendants' retaliation, sought to disguise its relationship with SourceOne, planning to announce the business relationship only after their annual trade show. Unfortunately, Defendants learned of the planned relationship in advance of the event and again threatened a boycott. In light of Defendants' recent boycotts of TDA's and AZDA's events, LDA abandoned its endorsement of SourceOne.

56.     The Colorado Dental Association ("CDA") reported to SourceOne in January 2015 that it was "concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA and our largest component society which hosts the Rocky Mountain Dental Conference each year" if it associated with SourceOne.

57.     Internal notes from the Virginia Dental Association ("VDA") reflect that Defendants' boycotts influenced the VDA not to pursue a relationship with SourceOne. The notes indicate VDA's awareness that the TDA has "had some push back from the major suppliers . . . but generally, members seem to be realizing significant savings and are happy with the [SourceOne] program." Later, the VDA observes that the push back has intensified: "TX has had some major pushback from the suppliers because of [SourceOne's] program. They had 15 companies pull out of the exhibiting [sic]

1   at the TDA Annual meeting in response to the [SourceOne] endorsement and have had some real

2   issues with their relationship with the suppliers. It was also noted that some [dental] offices have had

3   issues when they need service from one of the main suppliers [Defendants Henry Schein, Patterson,

4   and Benco] for something in the office. When they are not ordering from the [incumbent] suppliers,

5   their priority on the repair list seems to slip." Ultimately, a November 6, 2014 email reflects that the

6   VDA, after "really think[ing] about the consequences of [endorsing SourceOne]," including the fact

7   that "major suppliers dealers will (are) very upset about this and won't take it laying down. I suspect

8   they will punish [state Dental associations] in some way," the VDA forwent the opportunity to

9   affiliate with SourceOne.

10       58.    In contrast, the Nevada Dental Association, which has no annual trade show for

11   Defendants to boycott and was less susceptible to Defendants' threats, did follow through with a

12   planned partnership with SourceOne.

13       59.    Defendants have also misrepresented to dentists the nature and quality of dental

14   supplies sold through SourceOne, misrepresenting them as expired, counterfeit, altered, unauthorized,

15   or otherwise unfit for their purpose.

16       60.    Defendants' conduct is pursued in unison. They facilitate their collusive conduct

17   through in-person meetings at trade shows, business and personal email, and through business and

18   personal cell phone calls and text messages. Their employees, many having previously worked for

19   another Defendant, had close relationships through social and business gatherings and shared a

20   common motive and opportunity to exclude SourceOne and similar competitors from the market.

21   They acted on that motive.

22       61.    Defendants communicated with each other about the TDA and reached an agreement

23   to boycott the TDA. On November 1, 2013, a Schein employee wrote to a colleague at Schein, "Let's

24   talk with P[atterson], Benco, . . . . [and] [n]ot give TDA a dime." Another Schein representative

25   responded, "I refuse to work with any manufacturer rep that sells through [SourceOne]. That's [what]

26   every distributor should say. The manufacturers will get scared and pull out."

27       62.    On or about October 15, 2013, the Schein South Texas Regional Manager had a phone

28

1   conversation with a Benco Regional Manager regarding TDA's partnership with SourceOne. The

2   Schein Regional Manager recounted in an email that, during the call, Schein and Benco employees

3   discussed their mutual interest in jointly boycotting the TDA and then agreed that they would reach

4   out to Patterson to ensure that all three would engage in a group boycott of TDA.

5       63.     In a February 1, 2014 internal email from DDS Dental, a dental distributor, DDS's Dr.

6   Seznik, relays that "Patterson was encouraging Schein to support them in pulling out of meetings"

7   for state dental associations that supported SourceOne.

8       64.     A March 31, 2014 email thread forwarded by David McCarley of McCarley Dental

9   reflects that at the South Dental Convention:

10       some of the vendors say that they were told by both Patterson and Schein not to have
         anything to do with TDA Perks or they would shelve their products nationwide. . . .
11       when I spoke with a Schein rep at their normal sized [booth], he said that they were
         still having higher-up corporate discussions on whether they would attend the TDA or
12       not, and that Benco was discussing the same. . . . [T]hey really do think that they can
         derail the [SourceOne] Perks program.
13

14

15       65.     That same email thread reflects that "Big Dental Suppliers are sending false info to

16   Dentists [about SourceOne]. Patterson reps have even called the TDA pretending to be Dentists

17   complaining. We have traced the calls back to the Reps. . . . If this is true I am sure the Board will

18   cut ties immediately with SourceOne."

19       66.     An April 21, 2014 SourceOne email, with the subject line "Group Boycott of our

20   company organized by largest dental suppliers," reflects that "TDA has received a significant number

21   of cancelations for their annual session (April 30–May 3) from a variety of manufacturers previously

22   confirmed to exhibit. Many of them cited pressure from both Henry Schein and Patterson as the reason

23   for the last-minute cancelation. Many of them informed the TDA that they were specifically

24   threatened by both companies that if they did not cancel their attendance at the conference, various

25   unpleasant things would happen to them."

26       67.     Boasting about the efficacy of their group boycott, Benco tweeted the day before the

27   TDA's meeting was scheduled to start: "texas meeting will not be the same without key venders there.

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

#skiptheTDA" on April 29, 2014. The tweet appears to have since been deleted.

68.    A July 22, 2014 email from Mike Wade of Benco to Patterson's Daniel Reinhardt reflects that "[w]e are of the same mindset. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea" to endorse SourceOne. Reinhardt confirms in that communication that "we will be pulling our sponsorship and attendance of the state meeting" and Wade confirms that they are "looking at pulling our sponsorship." Wade also confirms that he "know[s] that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ."

69.    On July 30, 2014, Benco's Wade wrote about the AZDA boycott to Brian Goslee of Dentsply, a dental manufacturer, writing: "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA's] meeting next year."

70.    And on August 1, 2014, a Benco email discussing the boycott of the AZDA's 2015 trade show notes that Benco is "extremely disappointed that the AZDA has decided to directly compete with Benco and our fellow distributors," and that Benco is "not alone in evaluating [its] participation in AZDA events. Both Patterson and Schein *leadership* have expressed that they will also review participation if the AZDA continues to" affiliate with SourceOne.

71.    Indeed, six months before Defendants' group boycott of the TDA's annual conference—and also months before the TDA itself learned that the three Defendants (as well as those manufacturers over which Defendants exercise influence) would not be attending—a sales representative from Tuttnauer, a manufacturer of dental vacuums and other products, visited Archer. This sales representative informed Archer that Defendants had agreed to boycott the TDA's event and that Tuttnauer and other manufacturers intended to join the boycott as a result of pressure from the Defendants, and encouraged Archer to boycott the event as well. The Tuttnauer representative specifically mentioned that the planned boycott was in reaction to the TDA's affiliation with SourceOne. Archer declined to participate in the boycott and attended the TDA's event.

14

72.     There is no pro-competitive justification for the group boycott by Defendants in aid of their price and margin fixing. In particular, Defendants forfeited substantial deposits at state dental association conferences. As Benco's Managing Director Rick Cohen publicly stated with regard to the importance of such trade shows: "not attending trade shows is not an option for us" because it would risk losing customers to attending distributors. This is why it was necessary for Defendants to boycott as a group. If they collectively agreed not to attend, none would lose business to the other and the business risk from the boycott diminished dramatically.

### Boycott Target: Discounter Archer & White

73.     From 2004 until 2008, Archer and its joint-venture partner Dynamic were relatively small distributors (contrasted to Defendants), but nonetheless sold nationwide, selling to 16,000 customers and earning millions of dollars in revenue annually. They offered equal or superior service, at markedly lower prices, causing a Schein employee to quip that the Defendants looked like "idiots" when they tried to compete against Archer using their collusive pricing. Jack Powers of Burkhart confided to Archer's Skip Pettus that Dynamic had hurt Henry Schein and Patterson at the national level. In fact, dating back to 1997, Archer had been told by Mark Mlotek, Schein's then in-house counsel, that if Archer refused to sell the business to Schein, Schein would put it out of business.

74.     By 2008 the Defendants' group boycott had put Dynamic out of business. Its boycott also had substantially impaired the ability of Archer to sell multiple lines of products or to compete effectively against the Defendants on a national level.

75.     In June of 2008, suffering from the Defendants' group boycott, an Archer sales representative, Skip Pettus, met with Henry Schein's Mark Lowery and Burkhart's Jack Powers. In that meeting, Pettus learned of the Defendants' long-standing price fixing conspiracy. Messrs. Lowery and Powers offered to end the group boycott of Archer if Archer agreed to maintain margins on their sales of dental products between 32% and 34%, the margins agreed upon by the conspirators.

76.     During this meeting, Schein's Lowery suggested to Archer's Pettus that if Archer "took price out of the equation, you know, you'd probably get along with more of the local people." He did not want to get beat on a sale "because of price" and that "I'd like to think I know where …

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

Jack [of Burkhart] is going to come in at [on price]." Lowery "consider[ed] Jack a good competitor. I like Jack." Lowery added, "[e]ven your vendors [manufacturers] that you do have, I think you'll get to maintain better relationships with them if you don't drop your drawers [offer low prices]," and that "if I'm not going to do it [enforce the boycott], they're going to put somebody else in my place to do it [enforce the boycott]."

77. Urging Archer to raise prices, Schein's Lowery queried, "Are you making money over there? . . . I mean, if you are making money, I'm going to say you probably thought you were going to make more money than what you're making."

78. Archer's Pettus pointedly asked what he had to do to "get along" with Defendants, to "get to a professional level" or be "accepted into the market" "just like a [Burkhart] or a Patterson is." Lowery reiterated that Archer's low pricing, or "drawer dropping," was the problem:

> . . . [W]e all have the ability to drop our drawers. You know we do. But . . . that's part of . . . the mutual respect with Jack . . . We all want to make a living. We  . . . all . . . are going to sell . . . at a good price where we all get paid.

79. Schein's Lowery also acknowledged the Defendants price fixing collusion where they would not undercut one another's prices: "If [customers] are price-checking you, that's the time to drop your drawers, . . . [but] that obviously muddies up the water . . . so, you know, I know probably Jack [of Burkhart] won't  . . . drop his drawers]. I think that's just keeping the integrity of the margins [prices]. . . . If they want [us] to sell without [high] margin [prices], I'm not even going to price it out." Confirming Lowery's intentions, Archer's Pettus replied: "What I'm hearing you say from a company standpoint, . . . [our] margins [have] got to be better [higher], especially on equipment." Lowery responded, "Yeah, . . . that seems to be the Achilles heel." Pettus confirmed: "[our] [l]ow margins on [dental] equipment?" Lowery responded, "Yeah."

80. As to Archer's intention to reinsert itself in the relevant distribution market as a full-service, nationwide dealer if the Defendants' boycott ended, Lowery asked: "Are you, are you still trying to be a full-service dealer? . . . You've got to have the full [line]?" Pettus answered, "I've got to have the full lines or, I - I mean . . . it doesn't work."

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

81.     The conversation then became more pointed. Archer's Pettus asked: "Let me just cut right to the . . . chase . . . there's indicators by . . . manufacturers that . . . there's been direct talk from [Schein] and others of: Hey, we just don't want him [Archer] in existence. Don't open him. Don't do whatever. If [Archer] raise[s] our prices, can we get relief from that? . . . If I raise my margins on equipment to an acceptable level . . . can there be relief?"  Schein's Lowery responded, "What . . . we don't want to do is come across [as] dictating the price to the end user. That will get us in a lawsuit. Guarantee it. But you know, a couple things. One is I think when everyone plays on the same field, it makes things a lot easier."

82.     Despite Lowery's concern that discussion of pricing was guaranteed to get Defendants into a lawsuit, that is precisely what he proceeded to do for the remainder of the conversation.

83.     Describing his discussion with the manufacturer Dental EZ about supplying Archer, Lowery recalled "whatever you're doing over there [with Archer's margins] make sure you're doing the same thing here. Because if you're going to be off, I'm going to know about it and you know, that's not going to fly. And that's when I'll shoot that up to corporate. But if we're all on the same playing field [charging the same margins], I said, we're cool."

84.     Lowrey then described how he wanted Archer to fall in line with the collusive pricing: "If we're both quoting a deal, let's make sure that we're both getting the same thing. . . . And you're selling it, if you're not going to be selling it, Jack [Burkhart] is going to be selling it, [or] Patterson's going to be selling it. . . . but I just want to make sure we're all on the same page. . . . Will my reps continue to call on your accounts? Absolutely. Will you continue to call on mine? Absolutely. But we know that the customer is making a decision based upon who they want to do business with -- not because we're slugging it out and killing each other on margins [prices]."

85.     Lowrey described Defendants as "the cool crowd," that it was "like high school" and that when Archer came on the scene, "[w]e'[d] already made our friends -- and you're not part of the cool crowd. We're the cool crowd."

86.     Archer's Pettus responded: "That's why I wanted to come in today and say: Okay, what can I do to where I'm not going to have to take a step back, to where I can continue to do

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

[business in the market]." Lowery responded that he "th[ought] you got your answer on that. . . . Let's play on the same field. . . . We can play ball together."

87.    Pettus asked whether "if I focus on that, if I maintain margins high, can I . . . rest assured that we're," and Lowery interrupted "[l]et's all just, you know, have the same goal in mind. . . . So that way it takes us out of the loop as far as slugging it out [on margins], and the doctor gets it for the same price no matter who they buy it from."

88.    Questioning what the "same price" was, Pettus noted, "I don't know what's good and what's bad," but before he could finish Lowery again interrupted, "North of 32 [percent margins]." Surprised by the high number, Pettus responded, "Really?" Mr. Lowery: "Yeah."

89.    Pettus then asked "[i]f I'm buying at the same as you're buying and we're going up competitively against people not against price, I need to be north of 32 every time?" Lowery's response confirmed the breadth and scope of the conspiracy: "You know, *unanimously across the industry*, as long as I've been in the dental business -- 32 -- and I know guys that actually get 34 on stuff . . . but you know, generally speaking, you know, 32 is always good . . . If you get 32 . . . everyone is going to get paid on it . . .  I think if you get down [to] 28, we all don't make a lot." He reiterated the ubiquity of the price fixing conspiracy among Defendants: "that's where we play ball at."

90.    Acknowledging the price discipline that Archer imposes on Defendants absent the Defendants' group boycott, Lowery admitted: "You know, 34? You know, if you get shopped [price checked] on [34] from Dynamic Dental, gets…your head handed to you [by the customer], you look like an idiot. . . . Now add those numbers up. 25 [percent margins]? I won't even freaking touch it."

91.    The propensity of dental practices to price check, and the fear of getting "your head handed to you" if your prices were out of line with the competition, highlights not only the competitive threat posed by distributors like Archer, which offered discounted margins ranging from 15% to 25%, but also that the Defendants' price fixing would be ineffective absent the participation of the major distributors.

92.    In another conversation between Archer's Pettus and Burkhart's Jack Powers on or

18

1   about June 2008, Powers acknowledged the illegality of the price fixing conspiracy, saying that

2   discussing margins makes him "uncomfortable," noting that "it's a funny country that we're living in

3   right now, different country, with some laws and things like that, you know, about competitors getting

4   together."

5        93.     Demonstrating the high level of familiarity and cooperation between Defendants,

6   Powers described their relationship with one another as follows: "I think we trust each other" and that

7   "all of these people could . . . call and ask for a favor and . . . I don't, I can't even remember turning

8   one of them down."

9                        **Other Boycott Targets Including Amazon**

10       94.     Defendants also boycotted other distribution competitors, perhaps most importantly,

11   Amazon, thwarting their efforts to establish or sustain themselves on a nationwide basis. The nation's

12   largest and most successful on-line retailer, Amazon is ideally positioned to purchase and supply

13   dental supplies at low cost and had begun to make inroads in the relevant distribution market.

14       95.     In a February 14, 2014 email, Schein described the competitive threat posed by

15   Amazon: "Amazon is a freight train that will drive down margins and within 18-24 months, at the

16   most, Team Schein will have to adapt or huge layoffs will occur."

17       96.     In response to this threat, Defendants agreed, as they did in response to competitive

18   threats from Archer and SourceOne, to boycott manufacturers supplying Amazon. In 2015, soon after,

19   at a large dental supply distributor conference held in Chicago, Defendants informed many of the

20   manufacturers in attendance, including 3M, that if they sold to Amazon, Defendants would cut them

21   off. Many major manufacturers acquiesced to the threats and refused to sell to Amazon

22       97.     Further, as part of the group boycott, Defendants threatened to cut off several online

23   sites for medical supply sales unless they agreed not to resell to dental offices. For instance, Schein

24   and Patterson sell some products that are used both by medical offices and dental offices. These cross-

25   over products can be obtained through online discounters for medical offices. However, as part of the

26   group boycott these online discounters are specifically forbidden to sell the exact same products to

27   dental practices. The websites require purchasers to certify that they are not dental offices in order to

28

<center>19</center>

1  be allowed to buy these products. There is no rational or efficiency justification for these sales

2  restrictions.

3

4  **"NO POACHING" MARKET DIVISION**
   **IN AID OF PRICE FIXING**

5      98.     In furtherance of the Defendants' price collusion, they agree not to actively recruit or

6  "poach" one another's sales representatives. Competition for sales to dental practices is relationship

7  driven. Defendants' sales representatives build strong business and personal relationships with their

8  dental practices, so the loss of a sales representative to another Defendant exposes the sales

9  representative's former employer to potential lost sales. Accordingly, the Defendants agree not to

10 actively recruit or poach one another's sales representatives. To enforce this agreement, Defendants

11 monitor and communicate about one another's hiring of sales representatives to ensure compliance.

12 For example, in February and March of 2012, the President of Schein and a Managing Director of

13 Benco exchanged text messages regarding Benco's hiring of a former Schein sales representative. On

14 March 2, 2012, the Benco Director texted, "[y]ou asked me to let you know re [the employee]. We

15 are hiring her, starts next week." In a later message, the Benco Director wrote:

16

17     We agreed that she would sit even though she didn't have a contract. And she did sit,
       even longer than the agreement says. We never talked about whether she counts

18     toward the limit. You fired her, we didn't recruit her.

19

20     99.     The no-poaching agreement has been described in the industry by dental

21 manufacturers, as well as by a representative of Benco, as an ongoing "gentlemen's agreement."

22     100.    The no-poaching agreement bolsters the efficacy of price collusion by reducing

23 competition for sales to dental practices. It also helps effect a division of the relevant market to help

24 suppress competition among Defendants for books of business.

25                          **HARM TO COMPETITION**

26     101.    Throughout the Class Period, members of the proposed California Class of Dental

27 Purchasers have purchased dental services from California dental practices directly purchasing dental

28                                      20

1  supplies from Defendants. As a result of the Defendants' price fixing, and their boycotting conduct

2  in aid of this collusion, Defendants have charged prices for dental supplies substantially above

3  competitive levels to dental practices, which in turn have passed the overcharges, all or in part, to the

4  members of the California Class.

5       102.   Defendants' conduct has impaired discounting distributors such as SourceOne and

6  Amazon, which offer distribution platforms on a nationwide basis at substantially lower prices.

7  Absent the group boycott, these entities would have disciplined Defendants' collusive pricing and

8  caused prices to dental practices for dental supplies to fall precipitously, and these practices would

9  have reduced their costs and thus their bills for dental services to members of the proposed Class.

10  Defendants' losses of market share would have compelled them to drop their prices to dental practices

11  to competitive levels and this would have prevented the pass-on of antitrust price injury to members

12  of the Class.

13       103.   The anticompetitive impact of Defendants' price-fixing and harm to competition are

14  readily apparent in Defendants' steadily increasing prices in the face of static demand for dental

15  supplies. As demonstrated in Figure 1, below, Defendants have raised prices in virtual lock step every

16  year since at least 2005, including in 2009 when one of the most uncertain economic times since the

17  Great Depression caused dental patients to defer dental expenses and demand for dental services

18  declined by 2%.

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

NATHANIEL DYLAN KRAMER V. HENRY SCHEIN, INC., ET AL.

Figure 1: Changes in Dental Supplies Demand Versus Distributor List Prices



104.    Defendants enjoy substantial net profit margins, with Patterson reaching a high of 11% in 2010 and 2011. These high net profit margins contrast sharply with the observed profit margins in other medical distribution sectors. For example, profit margins for the "big three" pharmaceutical distributors in the United States (McKesson, Cardinal Health, and AmerisourceBergen) range from 0.2% to 1.5% and the most recent quarterly profit margins are between 0.9% and 1.37%.

105.    Accordingly, Defendants have been a material cause of harm to competition and antitrust price injury inflicted on dental practices and members of the Class.

106.    Their conduct has also harmed competition by reducing choice for dental practices in the relevant distribution market and diminished innovation for dental supply distribution. There are no legitimate, non-pretextual, procompetitive justifications for Defendants' anticompetitive conduct and, even if there were, there are less restrictive means of achieving those purported procompetitive effects. To the extent that Defendants' anticompetitive conduct has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

107.    The Defendants' anticompetitive conduct is continuing, and so are the overcharges suffered by members of the Class.

**FRAUDULENT CONCEALMENT**

108.    Dental practices and members of the Class, through the exercise of reasonable diligence, could not have discovered Defendants' wrongful conduct or the resulting antitrust injury any sooner, because Defendants fraudulently concealed and affirmatively misled dental practices as to their conduct and the resulting anticompetitive impact on prices paid by these practices and members of the Classes.

109.    By its very nature, the success of a conspiracy has depended on the conspirators' concealment of its existence. Recognizing both the illegality of the conspiracy and the need to disguise its existence, un-named co-conspirator distributor Burkhart in the person of Jack Powers told Schein's Mark Lowery and Dynamic's Skip Pettus in 2008 that they "have to be very careful, if a customer doesn't like us, they could have us all up on price fixing. . . . Price fixing or—or somebody complaining about getting together as a group and saying: Okay, well, we're going to hold to a certain margin."

110.    Archer's August 31, 2012 lawsuit was the first publicly-available information that Schein had participated in an anticompetitive conspiracy.

111.    A complaint by the Texas Attorney General filed in April 2015 was the first publicly-available information that Benco had participated in an anticompetitive conspiracy.

112.    SourceOne's September 2015 complaint was the first publicly-available information that Patterson had participated in an anticompetitive conspiracy.

113.    Dental practices and members of the Class could not through reasonable diligence have discovered the anticompetitive conspiracy at an earlier time due to the inherently self-concealing nature of the conduct as well as Defendants' efforts to conceal their conduct.

114.    As the Texas Attorney General has alleged, Benco and its conspirators' employees "interact regularly in person, at various social gatherings, and industry or trade association meetings, and remotely, through company email, personal email, personal cell phone calls, company cell phone

1   calls, and text messaging," providing them the opportunity, which they exercised, to conspire without

2   detection. For example, the President of Schein and a Managing Director of Benco communicate

3   regularly via text message and in-person meetings.

4        115.    Defendants are careful to conceal their conspiracy. In an April 6, 2015 email, a Schein

5   employee wrote to a Benco employee: "My personal email is [redacted]@hotmail.com. Let's take

6   this conversation there." And in a July 21, 2014 email chain between Patterson and Benco discussing

7   "pulling [their] sponsorship and attendance of the [Arizona] state meeting" as a result of the AZDA's

8   affiliation with SourceOne, Patterson's Daniel Reinhardt concludes: "Please discuss [this] live and

9   no further emails." Patterson's Dave Misiak gave a similar instruction to Patterson employees on the

10  same day: "Please discuss live and no emails on this topic."

11       116.    In 2008, a Schein manager gave instructions to keep their price-fixing secret, "to make

12  it invisible with the customer because we don't want to compromise that end of it and make it look

13  like we are . . . having a big conspiracy going on."  On September 30, 2013, shortly before the boycott

14  of the TDA, Schein's President Tim Sullivan requested that Patterson's CEO Scott Anderson call him

15  directly. Patterson wrote to a manufacturer in an October 25, 2013 email, "Sometimes these fights

16  are better behind closed doors and not with the sales force knowing."

17       117.    There is no conceivable way dental practices and members of the Classes, through the

18  exercise of reasonable diligence, could have gained knowledge of conspiratorial conduct undertaken

19  through business email, personal email, text messages, and phone conversations --with the stated

20  intent of keeping the cartel "invisible [to] the customer." Defendants falsely reported to  dental

21  practices that the price increases were the result of increasing "shipping costs." Also, Defendants used

22  code words, even among themselves, to describe their price fixing scheme, such as "keeping the

23  integrity of the margins."

24       **CLASS ACTION ALLEGATIONS**

25       **California Class of Dental Purchasers**

26       118.    Plaintiff brings this class action on behalf of the following class (the "California Class

27  of Dental Purchasers"):

28

Plaintiff represents a Class of all persons residing in California purchasing and/or reimbursing for dental services from California dental practices on or after August 31, 2012.

Excluded from the class are employees of Defendants or its affiliates, the Presiding Judge and employees of this Court, as well any Appellate Judges reviewing any findings in this matter and any employees of the Appellate Court.

119.    Prosecution of the claims of the Class as a class action is appropriate under Fed. R. Civ. P. 23(a) because:

(a) The number of persons in the Class is in the millions, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Plaintiff's lack of knowledge of the identity and addresses of all members of the Class.

(b) There are numerous questions of law and fact arising from the pattern of conspirators' restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendants have engaged in per se restraint of trade; and (2) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted indirectly on members of the Class.

(c) The claims of the Plaintiff are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Plaintiff and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

(d) The Plaintiff and Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims

1       of the Plaintiff and the other members of the Class.

2           120.    In addition, the prosecution of the claims of the Class as a class action pursuant to

3       Rule 23(b)(3) is appropriate because:

4               (a) Questions of law or fact common to the members of the Class predominate

5               over any questions affecting only its individual members; and

6               (b) A class action is superior to other methods for the fair and efficient resolution

7               of the controversy.

8                               **CLAIMS FOR RELIEF**

9                             **FIRST CAUSE OF ACTION**

10                  **Violation of Cal. Bus. and Prof. Code §§ 16720 *et seq.***

11                              **[The Cartwright Act]**

12          121.    Plaintiff incorporates by reference the foregoing allegations set forth above as if fully

13      set forth herein.

14          122.    Defendants' conduct in engaging in combinations of capital, skill and acts with others

15      with the intent, purpose and effect of carrying out restrictions in trade and commerce; increasing the

16      price and limiting and reducing the supply of dental supplies; and restraining trade and preventing

17      competition in the relevant markets for the United States relevant market for the distribution of dental

18      supplies is a per se restraint of trade in violation of the Cartwright Act.

19          123.    As a result of Defendants' unlawful conduct, competition has been harmed and

20      members of the California Class of Dental Purchasers have suffered indirect antitrust price injury in

21      their business or property and have been deprived of the benefits of competition.

22          124.    Plaintiff is entitled to treble damages and an injunction against Defendants preventing

23      and restraining the continuing violations alleged herein.

24                            **SECOND CAUSE OF ACTION**

25                  **Violation of Cal. Bus. and Prof. Code §§ 17200 *et seq.***

26                            **[Unfair Competition Act]**

27          125.    Plaintiff incorporates by reference the foregoing allegations set forth above as if fully

28

26

1   set forth herein.

2        126.    Defendants' conduct in engaging in combinations of capital, skill  and acts with others

3   with the intent, purpose and effect of carrying out restrictions in trade and commerce; increasing the

4   price and limiting and reducing the supply of dental supplies; and restraining trade and preventing

5   competition in the relevant markets for the United States relevant market for the distribution of dental

6   supplies constitutes unfair competition and unlawful and unfair business acts and practices within the

7   meaning of California Business and Professions Code § 17200.

8        127.    As a result of Defendants' violations of Business and Professions Code § 17200,

9   Defendants have unjustly enriched themselves at the expense of Class members identified

10   hereinabove. Defendants' unjust enrichment continues to accrue as it continues to engage in its

11   unlawful business and unfair acts and practices.

12        128.    To prevent their unjust enrichment, Defendants should be required pursuant to

13   Business and Professions Code §§ 17203 and 17204 to disgorge their illegal gains for the purpose of

14   making full restitution to all injured class members identified hereinabove. Defendants should also

15   be permanently enjoined from continuing their violations of Business and Professions Code §17200.

16                                     **RELIEF REQUESTED**

17        WHEREFORE, Plaintiff prays that:

18        A.    This Court declare that Defendants have engaged in combinations of capital, skill and

19   acts with many others constituting a trust for the purpose of acquiring and perpetuating their *per se*

20   restraint of trade of the relevant market, creating and carrying out restrictions in trade or commerce,

21   limiting and reducing the production and increasing the price of merchandise or a commodity, and

22   preventing competition in the manufacture, transportation, sale or purchase of merchandise, products,

23   or a commodity, in violation of the Cartwright Act (California Business and Professions Code §§

24   16720 *et seq.*) and unfair competition and unlawful and unfair business acts and practices in violation

25   of the California Unfair Competition Act (California Business and Professions Code §§ 17200 *et*

26   *seq.*);

27        B.    This Court permanently enjoin Defendants and its agents and employees from

28

1   continuing their unlawful acts set forth herein;

2         C.     Plaintiff and the members of the California Class of Purchasers of Dental Services

3   recover their actual damages, in an amount to be determined at trial, and threefold the damages they

4   have sustained and will have sustained as a result of the violations alleged here, pursuant to California

5   Business and Professions Code § 16750;

6         D.     This Court order Defendants to make full restitution to the Class members who have

7   been and continue to be injured by Defendants' unjust enrichment in violation of § 17200, pursuant

8   to Business and Professions Code § 17203 and § 17204;

9         E.     Plaintiff and the members of the Class recover their reasonable attorneys' fees and

10   costs of suit; and

11         F.     Plaintiff and the members of the Class recover pre-judgment and post-judgment

12   interest on the above sums at the rate allowed by law.

## JURY TRIAL DEMANDED

14      Plaintiff demands a trial by jury of all claims alleged herein so triable.

15   Dated: October 9, 2018             Respectfully submitted,

**SCHNEIDER WALLACE**
**COTTRELL KONECKY**
**WOTKYNS LLP**
By: */s/ Jason H. Kim*
Jason H. Kim
Todd M. Schneider
2000 Powell Street
Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Fax: (415) 421-7105

jhkim@schneiderwallace.com
tschneider@schneiderwallace.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BERRY LAW PLLC**
R. Stephen Berry (to be admitted *pro hac vice*)
1100 Connecticut Avenue, NW
Suite 645
Washington, DC 20036
Telephone: (202) 296-3020
Fax: (202) 296-3038
sberry@berrylawpllc.com

Attorneys for Plaintiff

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
NATHANIEL DYLAN KRAMER v. HENRY SCHEIN, INC., ET AL.